# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF INDIANA
# SOUTH BEND DIVISION

JUSTIN JORDAN,                    )
                                  )
Plaintiff,                        )
                                  )
vs.                               )     NO. 3:08-CV-380
                                  )
TDY INDUSTRIES, INC.,             )
d/b/a ATI CASTING SERVICES,       )
                                  )
Defendant.                        )

## OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment, filed on February 2, 2010. For the reasons set forth below, this motion is **GRANTED**. Jordan's federal claims (Counts I and II) are dismissed with prejudice and his state law claims (Counts III and IV) are dismissed without prejudice.

BACKGROUND

Plaintiff, Justin Jordan ("Jordan"), was employed by Defendant, TDY Industries, Inc. d/b/a ATI Casting Services ("TDY"), for twenty-nine days in 2007. TDY manufactures and distributes large metal castings at its foundry in LaPorte, Indiana. (Johnson Dec. ¶ 1). With the exception of specialized labor, TDY hires all employees as chipper/grinders. (Johnson Dec. ¶ 6). The chipping/grinding position is physically demanding and requires

-1-

employees to operate heavy tools and vibrating air hammers on large metal castings in excess of 15,000 pounds. (Johnson Dec. ¶ 7). Chippers/grinders chip and grind away excess metal and debris from the castings after they are removed from the casting molds. (Johnson Dec. ¶ 8). The job description provides that employees in this position "must frequently lift and/or move up to 50 pounds and occasionally move up to 100 pounds." (Jordan Dep. p. 51; Ex. 3).

All employees are hired on an at-will basis and are subject to a ninety (90) day probationary period, which is explained to the new hires through a Probationary Agreement. (Johnson Dep. pp. 12, 13, 15). TDY has an Employee Handbook that contains an anti-harassment policy, which states that an employee that harasses another will be subject to dismissal. (Johnson Dec. ¶ 3, Ex. A). TDY also has a Work Expectations Policy, which explains the physical demands of the work at the foundry. (Jordan Dep. pp. 56-57, Ex. 6). In addition, TDY has a Return to Light Work Duty Policy, which provides that it "is intended to accommodate temporarily the employee who has sustained injury but is able to work with restricted duties for the purpose of remaining productive and aiding in the rehabilitation process." (Jordan Dep. Exs. 5, 22).

Jordan was hired as a chipper/grinder on June 11, 2007. (Jordan Dep. pp. 41, 46, 63). At his orientation, he received and reviewed the Probationary Agreement, anti-harassment policy, Light

Duty Policy, and Work Expectations Policy. (Jordan Dep. Exs. 1, 2, 4, 5, 6, 8). Jordan worked the third shift earning $9.24 per hour. (Jordan Dep. pp. 64-65; Brown Dep. at 35). Danny Brown was Jordan's direct supervisor. (Jordan Dep. p. 62). Brown reported to Robert Sloan, the general foreman. (Jordan Dep. p. 130).

Jordan worked his first four days in the chipper/grinder position. (Jordan Dep. p 64; Brown Dep. pp. 24, 27). However, there was no improvement in Jordan's performance after working four days. (Brown Dep. pp. 24, 27). Brown moved Jordan to work in the re-clean area in order to learn how to handle the tools. (Sloan Dep. p. 39; Brown Dep. pp. 24, 27). In the re-clean area, employees finish the completed castings by grinding off any residual metal or burnt sand; it is the final stop for castings before they are shipped to clients. The re-clean assignment is physically less demanding than the chipper/grinder. (Brown Dep. pp. 26-27).

On June 21, 2007, Brown observed no improvement in Jordan's performance in the re-clean area and, as a result, again moved Jordan; this time to the "chills." (Jordan Dep. p. 66; Brown Dep. Ex. 13; Sloan Dep. p 39). In the chills area, the employees use lighter tools, including a two (2) pound hammer and small grinder to remove metal fins from small metal castings. (Brown Dep. pp. 30-31). Although Jordan does not remember Brown telling him anything about performing inadequately, Jordan was not working up

to Brown's satisfaction. (Brown Dep. pp. 30, 31, 33; Jordan Dep. p. 65-66).

On Saturday, June 30, 2007, while working in the chills using a two pound hammer to know fins off of castings, Jordan's hammer glanced off the side of the casting, causing pain to his elbow. (Jordan Dep. p. 67). Jordan reported this injury to TDY's management. (Jordan Dep. p. 69; Brown Dep. p. 36). Because it was a Saturday, and no member of the on-site nursing staff was present to assess the injury, Jordan was sent home and told to ice his elbow, take some over the counter medication and follow up with a company nurse on Monday. (Johnson Dep. p 37; Brown Dep. p. 40; Jordan Dep. pp. 70-72).

On Monday, July 2, Jordan visited TDY's on-site nurse, who referred him to a physician. (Brown Dep. P. 40; Daniel Dep. Ex. 10). Jordan did not work this day. (Daniel Dep. Ex. 10). On Tuesday, July 3, Jordan visited a physician, was diagnosed with an elbow strain and released with work restrictions. (Jordan Dep. pp. 73-74; Ex. 10). Jordan was limited to a maximum lifting, pushing and pulling of ten (10) pounds on his right arm and instructed to follow up with his doctor on July 6, 2007. (Jordan Dep. p. 74; Ex. 10). Later in the day after his doctor's visit, Jordan reported for work at his usual time (4:00 p.m.) and relayed his work restrictions to Brown. (Jordan Dep. pp 75-76; Brown Dep. Ex. 14). Because Jordan was not able to perform the functions of his job in

chills or on the hill with the imposed restrictions, Brown assigned Jordan an available light duty task of sweeping the foundry floor. (Jordan Dep. p. 76; Brown Dep. p. 42, Ex. 12). Jordan complained to Brown that sweeping was hurting his arm. (Jordan Dep. pp. 76-77; Brown Dep. p 44; Ex. 13). Then, Jordan was asked to pick up paper and other trash off of the break room floor and throw it away. (Jordan Dep. p. 79; Brown Dep. p. 44; Ex. 14). Jordan complained that this hurt his harm, too. (Jordan Dep. pp. 80-82, 85; Brown Dep. p. 46; Ex. 14). Jordan asked if he could stay and do a different job involving paperwork. (Jordan Dep. pp. 80, 86). However, Brown said no because the office was closed and, even though Jordan did not way he wanted to go home, Jordan was sent home. (Jordan Dep. pp. 80-82, 86, 93; Brown Dep. p. 44; Ex. 14).

On Thursday, July 5, Jordan called in to work to report that he would not be coming into work because his elbow still hurt him. (Jordan Dep. p 106; Johnson Dep. p. 40). On Friday, July 6, Jordan visited his physician. (Jordan Dep. pp. 82-83; Ex. 12). At this visit, the physician released Jordan with a fifty (50) pound lifting, pushing and pulling restriction, with a twenty (20) pound limit on his right arm. (Jordan Dep. Ex. 12). Jordan was also instructed to wear a brace and apply ice to the arm for ten (10) to fifteen (15) minutes every three (3) hours. Jordan Dep. Ex. 12). Jordan was to visit the physician again on July 10, 2007. (Jordan Dep. Ex. 12).

On July 9, Jordan visited the on-duty nurse at TDY and reported that he felt well enough to be released to full duty. The nurse told him that he needed to be released by his treating physician before he could be returned to full duty. (Jordan Dep. pp. 88-89). Later that day, Jordan's treating physician released him without limitation. (Jordan Dep. Ex. 13).

Also on July 9, Cindy Johnson, TDY's Human Resources Director, returned from a week long vacation. (Johnson Dep. p. 23). When she returned, she reviewed her e-mails and notes from Brown regarding Jordan's job performance and the events of June 30 through July 9. (Johnson Dep. p. 23). These materials described Jordan's inability to operate tools, his ineffectiveness to work when provided light-duty work, and not being able to operate hammers. (Johnson Dep. p. 23; Jordan Dep. Ex. 14). After reviewing these documents, Johnson made the decision to terminate Jordan due to failing the probationary period. (Johnson Dep. p. 24). She concluded that Jordan was a probationary employee that did not show evidence of improving. He could not successfully complete any of the three of the easiest jobs at the foundry. In addition, after he was injured, he was give light-duty work, but he was unwilling to pick up litter and trash in the parking lot. Moreover, Jordan called off on July 5. Typically, when Johnson is ready to terminate a probationary employee she would speak to the employee's supervisor before termination of employment. (Johnson

Dep. p. 24). However, Brown was on vacation that day, so Johnson spoke with her boss, David Neil instead. (Johnson Dep. p. 24).

In Count I of the Complaint, Jordan alleges TDY discriminated against him under the Americans with Disabilities Act, 42 U.S.C. section 12101, et seq. ("ADA"). In Count II, Jordan alleges retaliation under the ADA, claiming that he was retaliated against for complaining about his job assignment and TDY's failure to accommodate his work restrictions. Counts III and IV allege state law claims of retaliatory discharge and a Frampton discharge.

Defendants seek summary judgment on all claims, arguing there is no genuine issue as to any material fact and that Defendant is entitled to judgment as a matter of law.

DISCUSSION

Summary Judgment Standard

The standards that generally govern summary judgment motions are familiar. Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In other words, the record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th

Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmovant. *Anderson*, 477 U.S. at 255; *Nucor Corp. v. Aceros Y Maquilas De Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The burden is upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes demonstrate an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (citing *Anderson*, 477 U.S. at 248).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of

material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original); *see also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate.

ADA Claims

Plaintiff asserts TDY engaged in *per se* discrimination under the ADA because they maintained an unwritten "100% Healed Policy," requiring Plaintiff to be entirely free from medical restrictions before returning to work. In addition, Plaintiff asserts a failure to accommodate and disparate treatment claim under the ADA, alleging that he was unlawfully discriminated against due to his perceived disability.

### *Per Se* Discrimination

Plaintiff claims that TDY had a "100% Healed Policy," which required him to be fully released to return to work, in contravention of the ADA. To require an employee to be medically released completely without restrictions does not allow for a case-by-case assessment of the individual's ability to perform the essential functions of the job, and can constitute a per se violation of the ADA. *Hendricks-Robinson v. Excel Corp.*, 154 F.3d

685, 698 (7th Cir. 1998).

Here, however, Jordan has not presented any evidence that TDY would not assess his ability to perform the essential functions of the job or return him to work until his physician completely lifted his medical restrictions. To the contrary, Jordan was never denied the opportunity to work because of his injury. After Jordan was given temporary work restrictions, TDY attempted to accommodate those restrictions by placing him on light duty jobs. Simply, TDY did not have a "100% Healed Policy."

At most, Jordan has shown that TDY does not allow employees with restrictions to return to a job that would require the employees to violate those restrictions. (Daniel Dep. p. 20). TDY's foundry has many jobs that require the employees to engage in extremely heavy lifting. (Daniel Dep. p. 20). If an employee has medically imposed restrictions that limit the employee's lifting, then TDY will not return the employee to the heavy duty job until a doctor releases them to perform activities that comport with that job. Jordan has shown nothing about TDY's policy that is discriminatory.

Failure to Accommodate/Disparate Treatment

The ADA protects "qualified individuals with a disability" from discrimination in their employment and the hiring process. 42 U.S.C. § 12112(a); *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 571-

72 (7th Cir. 2001). In order to prove actionable discrimination under the ADA, a plaintiff must show: (1) that he is disabled within the meaning of the ADA; (2) that he is qualified to perform the essential functions of the job; and (3) that he suffered an adverse employment action because of her disability. *Nese v. Julian Nordic Constr. Co.*, 405 F.3d 638, 641 (7th Cir. 2005). A complaining party can demonstrate discrimination by either providing direct evidence of discriminatory motive or intent, or by relying on the indirect method outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Disabled within the meaning of the ADA

The first question that must be addressed is whether Plaintiff is disabled, as defined under the ADA. If he is not disabled, then he cannot pursue a claim under the ADA. An individual can prove that he is disabled for ADA purposes in one of three ways: (1) he has a physical or mental impairment that substantially limits one or more major life activities; (2) he has a record of such an impairment; or (3) he is regarded as having such an impairment by her employer. 42 U.S.C. § 12102(2); *Sutton v. United Air Lines*, 527 U.S. 471, 478 (1999).

    (1)  Actually disabled–substantially
           limited in a major life activity

There is no dispute that Plaintiff hurt his elbow while

-11-

working at TDY. However, whether that injury is tantamount to being disabled under the ADA is a different inquiry.

In determining if an impairment is substantially limiting, this Court considers: (1) the nature and severity of the impairment; (2) the duration or expected duration of impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of, or resulting from, the impairment. 29 C.F.R. § 1630.2(j). Plaintiff does not argue that he was actually disabled. This is not surprising as the evidence overwhelmingly demonstrates that his elbow injury did not limit any major life activity.

### (2) Record of disability

As set forth above, even if Plaintiff does not have a physical or mental impairment that substantially limits one or more major life activities, he is still "disabled" under the ADA if she has a record of such an impairment. However, Plaintiff does not argue that he has a record of disability.

Nevertheless, while TDY may have had records of his elbow injury, these are not evidence that she had a record of being statutorily disabled. *Rooney v. Koch Air, LLC*, 410 F.3d 376, 381 (7th Cir. 2005). Again, not all impairments qualify as a disability within the meaning of the ADA. *Dalton v. Subaru-Isuzu Auto.*, 141 F.3d 667, 675 (7th Cir. 1998).

### (3) Regarded as disabled

Jordan contends that TDY regarded him as disabled due to the elbow injury he suffered. Plaintiff can demonstrate that he was "disabled" for ADA purposes if he was regarded as having a physical or mental impairment that substantially limits one or more major life activities. He may proceed under this theory by showing "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities; or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton*, 527 U.S. at 489. However, Plaintiff does not present any evidence to support such a proposition.

Jordan argues that the record establishes that TDY considered him substantially limited in the major life activity of working. "When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999).

At most, Plaintiff could contend that TDY viewed him as having a temporary elbow strain and, therefore, having to work with medically imposed pushing, pulling and lifting restrictions for a short period of time. This argument would fail though because the

"substantially limits" test cannot be simply met by showing that the employer thinks the employee is temporarily injured. *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 198 (2002); *Hancock v. Potter,* 531 F.3d 474,479 (7th Cir. 2008); *Harris v. The Picture People*, No. 03 C 3032, 2004 WL1898784 *10 (N.D. Ill. Aug 20, 2004).

Not only is the limited duration of Jordan's injury problematic but so too is the nature of the injury. Jordan's physician never restricted him from working. On July 3, Jordan was restricted to lifting, pulling and pushing no more than ten (10) pounds. On July 6, that restriction was changed so that he was released to lift, push and pull up to fifty (50) pounds; twenty (20) pounds with the right arm. These restrictions are not severe enough for TDY to believe that Jordan was disabled in the major life activity of working. *Delgado v. Certified Grocers Midwest, Inc.*, 282 Fed. Appx. 457, 461 (7th Cir. 2008).

To be regarded as disabled, the employer must think the employee is substantially limited in a major life activity. There is no evidence in the record that Plaintiff was regarded as being substantially limited in any major life activity by TDY. To the contrary, the undisputed evidence shows that TDY did not believe that Jordan was substantially limited in the major life activity of working. Indeed, after his injury, they gave him light duty work to do at the foundry. Consequently, because has submitted no

evidence to allow a jury to find that TDY believed that he suffered from a serious, permanent or long-term impairment, his "perceived impairment" claim fails as a matter of law.

State Law Claims

The claims remaining for the Court's consideration are Jordan's claims under Count III and IV for the retaliatory discharge and Frampton discharge. Upon due consideration, these claims are **DISMISSED WITHOUT PREJUDICE** because the federal claims have been dismissed prior to trial. 28 U.S.C. § 1367(c); *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").

**DATED: May 10, 2010**                    /s/RUDY LOZANO, Judge
                                           **United States District Court**